**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                           **Case No. 2:22-cr-00098**

**KELVIN BRADLEY**

**DEFENDANT'S *BRUEN*-BASED MOTION TO DISMISS**

This matter is before the Court on a two-count indictment, charging Mr. Bradley with unlawfully possessing a Colt .38 Special revolver on December 19, 2020 which had the manufacturer's serial number removed, obliterated, and altered, after having sustained a September 3, 2002 Michigan conviction for felony aggravated stalking. Mr. Bradley is thereby alleged to have violated 18 U.S.C. §§ 922(g)(1) and (k). ECF No. 1.

Mr. Bradley was federally indicted on May 3, 2022.[1] On June 23, 2022, the Supreme Court of the United States rendered its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* marked a dramatic shift in Second Amendment jurisprudence. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *See e.g. United States v. Carter*, 669 F.3d 411 (4th Cir. 2012); *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85 (3rd Cir.

---

[1] Mr. Bradley was indicted on the same date and faces the same charges as the defendant in *United States v. Price*, wherein Judge Goodwin concluded that section 922(k) is unconstitutional in light of *Bruen*. *See Price,* No. 2:22-CR-00097, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022).

2010)(holding 18 U.S.C. § 922(k) constitutional post-*Heller* using mean-end scrutiny). *Bruen* rejected that approach, instructing courts to only consider "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency and the governmental burden are both demanding: a firearm regulation is consistent with American tradition only if the government can demonstrate that similar regulations were widespread and commonly accepted during the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, the Court should dismiss the indictment in this case, which charges him with violations of 18 U.S.C. §§ 922(g)(1) and 922(k). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Bradley's conduct is presumptively protected. The government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear in the United States until the 20th century, were unknown to the generation that ratified the Second Amendment. And manufacturer serial number requirements and removal prohibitions, which did not exist before 1968, were equally unknown to the founding generation. As a consequence, defendant's indictment must be dismissed.[2]

---

[2] Unless otherwise indicated, case quotations in this motion omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

I.     **Legal Background.**

A. **Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.**

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). In holding that the Second Amendment applies to the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."

*Id.* at 767. That right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

### B. *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."

*Bruen* expressly disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was

straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. In other words, a tie goes to Mr. Bradley. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving post enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of

the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

*Bruen* holds that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, its statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were

unimaginable at the founding"). Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court also stressed the limits of reasoning by analogy:

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* (emphasis in original).

Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-established and representative" historical analogue); *id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic"). A handful of "outlier" statutes or cases from a small number of "outlier

jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-Century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were closest to New York's—as unrepresentative. *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130; *see also, e.g.*, *id.* at 2141 n.11 ("But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope."). Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

## II.    Argument

Under the framework announced in *Bruen*, both §§ 922(g)(1) and 922(k) violate Mr. Bradley's Second Amendment right to keep and bear arms. The amendment's "plain text" does not differentiate between convicted felons and other members of "the people," and a total prohibition on firearm possession by felons therefore presumptively violates the Second Amendment. Similarly, the Amendment's text does not distinguish between bearing arms that have manufacturer's serial numbers and those which do not, and a prohibition and even criminalization of possessing a firearm with the manufacturer's serial number removed likewise presumptively violates the Second Amendment. The government will be unable to rebut that presumption on either count of defendant's indictment. Felon-disarmament laws, which did not appear in this country until the 20th century, were unknown to the founding generation. There was no "historical tradition," as of 1791, of barring felons from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. Likewise, 18 U.S.C. § 922(k) – prohibiting the possession of firearms without manufacturer's serial numbers - was enacted as part of Pub. Law 90-618, Sec. 102, 82 Stat. 1213, 1220 – effective October 22, <u>1968</u> (further amending Chapter 44 of Title 18 as part of the second version of the 1968 Gun Control Act). As a consequence, Section 922(k) and its manufacturer serial number requirement is anything but a longstanding firearm prohibition, and certainly not one that existed when the Second Amendment was ratified. Which is why this Court should dismiss both counts of Mr. Bradley's indictment with prejudice.

### A. The government will be unable to carry its burden of establishing a historical tradition of felon-disarmament laws.

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is not difficult. The Second Amendment protects the right of "the people" to "keep and bear arms." Possession of a firearm, the conduct proscribed by § 922(g)(1), easily qualifies as "keep[ing]" and "bear[ing]" arms. *See Heller*, 554 U.S. at 628-29 (holding statute that barred possession of handguns in the home unconstitutional).

Mr. Bradley is also part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text" suggests that those who have been convicted of a felony are unentitled to the amendment's protection. *I*

*Heller* supports this conclusion. Construing the words "the people" in that case, the Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580 (emphasis added). The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." *Id.* (emphasis added); *see also Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)). Interpreting "the people" to exclude felons would conflict with that principle. It follows, then, that even "dangerous felons" "are indisputably part of 'the people'" for Second Amendment purposes. t

*United States v. Rahimi*, 59 F.4th 163, 171 (5th Cir. 2023); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also, e.g.*, *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (concluding "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community"); *see also Kanter v. Barr,* 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, Dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons.")

Because "the Second Amendment's plain text covers Mr. Bradley's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. *Bruen*'s position here is consistent *Heller*'s premise that all modern gun regulations were adopted subject to rational basis review of what is now an unconstitutional interpretation of the Second Amendment (that its protections only extended to citizens in organized militia service). To rebut the presumption of constitutional protection, in lieu of means-end scrutiny - the government must now establish that § 922(g)(1) and 922(k) are "consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that § 922(g)(1) is designed to address—i.e., ex-felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.* The government will be unable to make that showing.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250,

1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus § 922(g)(1) is firmly rooted in the twentieth century. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, the Court in *Bruen* refused to "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Even if the Court broadens its focus to consider state statutes as well, § 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law,

has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); *accord N.R.A.*, 700 F.3d at 197 ("[A] strictly originalist argument for . . . bans on firearm possession by felons . . . is difficult to make.").

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have

adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by violent felons. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

The government cannot attempt to justify § 922(g)(1) by resorting to "analogical reasoning." *Id.* at 2132. According to *Bruen*, that mode of analysis is available only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.* But the potential danger posed by felons' access to firearms would have been neither unprecedented nor unimaginable to the Founders. As a result, the government cannot rebut the presumption of unconstitutionality by identifying a "historical analogue" to § 922(g)(1). *Id.* at 2133.

Even if analogical reasoning were appropriate in this case, however, it would not aid the government. Defendant is unaware of a historical tradition of founding-era statutes that are "relevantly similar" to § 922(g)(1). *Id.* at 2132. The government will therefore be unable to shoulder its heavy burden of rebutting the presumption of unconstitutionality.

### B. *Heller*'s statements about "presumptively lawful regulatory measures" and "law-abiding, responsible citizens" do not control this case.

The government will no doubt sidestep the straightforward *Bruen* analysis above by falling back on passages from *Heller* that supposedly place felons outside the protection of the Second Amendment. In the government's view, these passages deem felon-disarmament laws "presumptively lawful" and limit Second Amendment rights to "law-abiding, responsible citizens." Neither passage justifies ignoring *Bruen*'s clear command. The first was *dicta* which has been superseded by *Bruen*; the second establishes a constitutional

baseline that protects, rather than limits, Second Amendment rights. These passages cannot save § 922(g)(1).

### 1.   "Presumptively lawful regulatory measures"

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Court in *Heller* inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It then added the following *dicta*:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court wrote, "We identify these *presumptively* lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26 (emphasis added).

The government will claim that this language definitively establishes that felon-disarmament laws are consistent with the Second Amendment. That view is incorrect. The question of felon-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *see also, e.g.*, *Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing "presumptively lawful"

language as "the opinion's *deus ex machina* dicta"). The result is that, as the *en banc* Seventh

Circuit has explained, the passage cited above should not be treated as a holding:

> The language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

*Skoien*, 614 F.3d at 640; *accord Tyler*, 837 F.3d at 687 (same).

Of course, lower courts should "give great weight to Supreme Court *dicta*," *N.L.R.B.*

*v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's

opinion engages in an "extended discussion" of an issue, the Court gives "full and careful

consideration to the matter," and the issue is "important, if not essential, to the Court's

analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however,

lower courts "are not bound by *dicta* or separate opinions of the Supreme Court." *Myers v.*

*Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's

discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19

F.4th at 347. The Fourth Circuit has therefore declined to follow Supreme Court *dicta* that is

"unaccompanied by any analysis from which [it] might gain insight into the Court's

reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008); *see also id.* at 283 (refusing

to "afford[] talismanic effect" to unexplained Supreme Court dicta). Other courts, too,

disregard *dicta* for which the Supreme Court provides no reasoning or analysis. *See, e.g.*,

*United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) ("[W]e

conclude that the brief dictum to which we allude should not dictate the result here."); *cf.*

*Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (choosing to follow Supreme Court dicta because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta").

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of *dicta* which is not entitled to "talismanic effect." *In re Bateman*, 515 F.3d at 283. It was "unaccompanied by any analysis," *id.*, and was—at best—"peripheral" to the questions at issue in that case, *Hengle*, 19 F.4th at 347. The *Heller* Court provided no "extended discussion" of felon-disarmament laws. *Hengle*, 19 F.4th at 346. While the Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting). Indeed, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The Court, in other words, did not even claim to have surveyed the relevant history or to have discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Winkler, 56 U.C.L.A. L. Rev. at 1567; *see also United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons.").

But as explained above, felon-disarmament laws are *not* longstanding—at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted

such a law until the 20th Century, and Congress did not pass the federal statute at issue here until 1938. *Heller*'s discussion of "longstanding" felon-disarmament laws, therefore, is not just *dicta*, but *dicta* based on a factually unsupportable premise. As the *en banc* Sixth Circuit has observed, absent "historical evidence conclusively supporting a permanent ban on the possession of guns" by felons, "it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right based on a past [felony conviction]." *See Tyler*, 837 F.3d at 687 (applying this reasoning to 18 U.S.C. § 922(g)(4)'s prohibition of firearm possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution," which aligns with another category of laws *Heller* called "presumptively lawful"); *see also id.* ("Refusing to give *Heller* conclusive effect in this case is particularly proper given § 922(g)(4)'s lack of historical pedigree.").

Heller itself indicates that its *dicta* should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be deprived of the [Second Amendment] right if that deprivation is consistent with history and tradition." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020). The Court's allusion to "expound[ing] upon the historical justifications" for felon-

disarmament laws would make no sense if the Court believed felons could be disarmed *regardless* of whether history supported that exclusion.

And—crucially—the Court stressed that it had not canvassed the historical record and made a determination, one way or the other, about whether that record supported felon-disarmament laws. *Heller*, 554 U.S. at 626 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment."). *Bruen*, in turn, affirmed that *Heller* did not purport to settle any questions beyond those necessary to resolve the petitioners' claim in that case. 142 S. Ct. at 2128 (noting *Heller* described Second Amendment right as "not unlimited," but adding, "[t]hat said, we cautioned that we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban"). It is therefore "particularly wrongheaded to read [*Heller*] for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

*Heller*'s discussion of *Lewis v. United States*, 445 U.S. 55 (1980) is particularly instructive. The defendant, convicted under the federal felon-in-possession statute, raised an equal protection challenge. *Lewis*, 445 U.S. at 58, 65. The Court rejected that argument, reasoning that Congress "could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm." *Id.* at 66. The *Heller* Court went out of its way to make clear it was not bound by *Lewis*' interpretation of the Second Amendment, writing, "It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a

footnoted dictum in a case where the point was not at issue and was not argued." 554 U.S. at 625 n.25.

To accept that *Heller* settled the constitutionality of felon-disarmament laws would be to do exactly what that case called "inconceivable": interpreting "the basic meaning" of the Second Amendment based on "a footnoted dictum in a case where the point was not at issue and was not argued." *See* 554 U.S. at 627 n.26 (describing felon-disarmament laws, in a footnote, as "presumptively lawful regulatory measures"). Indeed, treating *Heller*'s "presumptively lawful" language as binding would be especially ironic given that, in the footnote *Heller* disclaimed as *dicta*, *Lewis* suggested felon-disarmament laws do not violate the Second Amendment. *Lewis*, 445 U.S. at 65 n.8 (citing three court of appeals opinions to that effect).

Finally, even if the *Heller dicta* might once have warranted deference, it no longer does today. The Fourth Circuit has said lower courts need not follow Supreme Court *dicta* that has been "enfeebled by later statements" in other Supreme Court cases. *Hengle*, 19 F.4th at 347. That is the case here. It may be true that "nothing in [*Heller*] cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, but *Bruen*'s new framework plainly *does* cast doubt on such laws. As explained above, *Bruen* demands a "text-and-history" analysis that looks only to "the Second Amendment's plain text" and our "Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126, 2138. Neither of those sources provides any support for felon-disarmament laws. It is perhaps unsurprising, then, that the Court in *Bruen* did not repeat *Heller*'s *dicta* about "longstanding" and "presumptively lawful" felon-disarmament laws.

Rather than following historically unsupportable *dicta* from *Heller*, this Court should adhere to the binding framework supplied by *Bruen*. Elevating *Heller*'s *dicta* over *Bruen*'s holding would treat the Second Amendment right "as a second-class right," contrary to the Supreme Court's admonishment in *McDonald*. 561 U.S. at 780.

### 2. "Law-abiding, responsible citizens"

In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this language, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms.

This argument plainly misreads *Heller*. The Court in *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, *at the very least*, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too.

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The cited passage references law-abiding, responsible citizens' use of firearms "in defense of hearth and home." *Id.* If that passage were meant to mark the outer limits of the Second Amendment, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and the Court in *Bruen* gave no hint that it believed it was contradicting what it said in *Heller*. *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

Movant recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *E.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But that is because the petitioners alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted *certiorari* to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*. *Heller*'s description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other *places*, and the same is true here: *Bruen*'s description of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other *people*.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the opinion would suffer from hopeless internal inconsistency. *Bruen*'s central lesson is that history is paramount in Second Amendment interpretation—a point the Court made over and over

again. *See, e.g.*, *id.* at 2127 ("[*Heller*] demands a test rooted in the Second Amendment's text, as informed by history."); *id.* ("[*Heller*] looked to history because 'it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.'" (emphasis in original)); *id.* at 2128-29 ("*Heller*'s methodology centered on constitutional text and history."); *id.* at 2129 (describing means-ends balancing as "inconsistent with *Heller*'s historical approach"); *id.* at 2130 (likening Second Amendment to First because, in both instances, "to carry [its] burden, the government must generally point to *historical* evidence about the reach of the [amendment's] protections" (emphasis in original)); *id.* ("And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims."); *id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2135 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."); *id.* at 2138 ("We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional."); *id.* at 2145 ("Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.").

Yet as explained above, the historical record provides no support whatsoever for felon-disarmament laws. The government's view is that *Bruen*'s *dicta* completely exempts

Section 922(g)(1) from the requirement that the limitations on Second Amendment rights be firmly rooted in history. Nothing in *Bruen* permits that result.

### C.  Conclusion

All of movant's arguments regarding § 922(g)(1) apply with equal force to § 922(k). Simply put, sections 922(g)(1) and 922(k) violate the Second Amendment as it was understood at the time of its adoption. As a consequence, this Court should dismiss defendant's indictment with prejudice, and order his immediate release from custody.

Respectfully submitted,

**Kelvin Bradley**
By Counsel

/s/*Isaac R. Forman*
Isaac R. Forman (WVSB #11668)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
(681) 265-3802 *office*
(304) 982-8056 *fax*
iforman@hfdrlaw.com