IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                CRIMINAL ACTION NO. 2:22-cr-00098

KELVIN BRADLEY,

        Defendant.

**MEMORANDUM OPINION & ORDER**

The Court has reviewed the *Motion to Suppress Post-Arrest Statements Obtained in Violation of the Defendant's Constitutional Rights* (Document 42), the *Response of the United States to Defendant's Motion to Suppress* (Document 44), the *Reply in Support of Motion to Suppress Post-Arrest Statements Obtained in Violation of the Defendant's Constitutional Rights* (Document 48), and video recordings of Mr. Bradley's post-arrest statements contained in *Exhibit 1 to the United States Response to Defendant's Motion to Suppress* (Document 44-1). The Court has also reviewed the testimony of Detective Boone[1] of the Charleston Police Department, heard during a suppression hearing held on April 24, 2023. For the reasons stated herein, the Court finds the Defendant's motion should be denied.

**PROCEDURAL BACKGROUND**

Kelvin Bradley is charged in the *Indictment* (Document 1) with possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. 922(g)(1), and possession of a

---

[1] At the time of the events relevant to this case, Detective Boone was serving as a patrolman. For clarity, he will be referred to as Patrolman Boone within this Order.

firearm with a removed, obliterated, and altered serial number in violation of 18 U.S.C. 922(k). The Defendant has filed a motion requesting suppression of his post-arrest statements made on the scene before he was given a *Miranda* warning and made at the police station after he was given a *Miranda* warning.

## FACTUAL BACKGROUND

On December 19, 2020, the Defendant was a passenger in an Uber stopped by Patrolman Boone with the Charleston Police Department. The reason for stopping the car was the Uber driver's failure to maintain the lights illuminating the vehicle's license plate and registration sticker. Patrolman Boone approached the vehicle and asked the driver and Mr. Bradley to produce a form of identification, which they did. Upon returning to his patrol vehicle, he ran their identification information on his computer. This search revealed that Mr. Bradley was wanted in Michigan for a parole violation.

Patrolman Boone returned to the vehicle and asked Mr. Bradley to exit the vehicle, and then placed him under arrest and in handcuffs. The following exchange occurred:

| | |
|---|---|
| Boone: | You know you have a parole violation? |
| Bradley: | Yes sir. |
| Boone: | Okay, alright. I gotcha man. What's the parole violation for, man? You have any idea? |
| Bradley: | For not reporting. |
| Boone: | It was for not reporting? |
| Bradley: | Yeah. |
| Boone: | Okay. What's the underlying charge? |
| Bradley: | Armed robbery, (indistinguishable and overlapping speech). |

2

| | |
|---|---|
| Boone: | Armed robbery? Long time ago? Okay, I gotcha. Anything on you I need to know about? |
| Bradley: | No sir. |
| Boone: | Anything in your bag I need to know about?[2] |
| Bradley: | Yes sir. |
| Boone: | What's in the bag? |
| Bradley: | I got a gun in the bag. |
| Boone: | You got a gun? |
| Bradley: | Yes sir. |
| Boone: | Are you a convicted felon? |
| Bradley: | Yes sir. |
| Boone: | Okay, here is what we are going to do. I appreciate your cooperation. |
| Bradley: | Can you push my glasses up, sir? |
| Boone: | Yeah, I gotcha. I appreciate your cooperation. Is there any dope in the car? |
| Bradley: | No sir. |

(Arrest Video, 7:30–8:30) (Document 44-1A.) Patrolman Boone performed a frisk of Mr. Bradley and asked him what type of firearm was in the bag and where in the bag the firearm was located. (*Id.* at 8:30–9:15.) Patrolman Boone continued to frisk Mr. Bradley and asked him questions about whether there was anything else of interest in the vehicle, how long Mr. Bradley had been in West Virginia, and what Mr. Bradley's age was. (*Id.* at 9:20–10:20.) At that point,

---

[2] The bag was a medium-sized travel bag that was in the backseat of the vehicle Mr. Bradley had been riding in.

3

Patrolman Boone asked another officer to watch Mr. Bradley and then walked around the vehicle and removed the bag. Before setting the bag down, Patrolman Boone asked, "Is this your bag sir?" to which Mr. Bradley replied, "Yes sir." (*Id.* at 11:00–11:05.) Patrolman Boone then opened the bag and located the firearm with the guidance of Mr. Bradley, who was providing directions as to its location. (*Id.* at 11:05–11:45.)

As Patrolman Boone removed the clothes covering the firearm, he asked Mr. Bradley why he was carrying the gun, and he responded that he had just bought the gun from somebody. (*Id.* at 11:25–11:40.) Patrolman Boone then walked away from the bag, leaving the Defendant and several officers standing around the bag and the gun. When Patrolman Boone returned to the bag, another officer again asked Mr. Bradley why he had the firearm, to which Mr. Bradley responded, "I don't know, he said I could sell it for like $1,000 because it was an antique." (*Id.* at 11:55–12:10.) As Patrolman Boone photographed the bag and searched the backseat, further conversation between the other officer and Mr. Bradley can be heard, but the conversation is not clear.

When Patrolman Boone returned to his patrol car, he was approached by Sergeant Sharp, who asked "So did he freely tell you where the gun . . . that he had a gun?" (*Id.* at 13:35–13:50.) In response, Patrolman Boone began recounting the stop, describing receiving the identification information, discovering the parole violation, and making the arrest. After listening to this, Sergeant Sharp told Patrolman Boone that he needed to cite the driver for a traffic violation "because that is your probable cause to stop the vehicle." (*Id.* at 14:45–15:10.) The conversation continued:

    Sharp:        At some point, while he verbally admitted that he had a gun.

4

| | | |
|---|---|---|
| Boone: | | Right. |
| Sharp: | | At some point you need to Mirandize him. |
| Boone: | | Yeah. |
| Sharp: | | If he is going to be under arrest – |
| Boone: | | It just kind of happened so quick. |
| Sharp: | | If he is going to be under arrest you Mirandize him, you can get that at the station, and probably interview him. |
| Boone: | | Yeah, and try and figure out who he got the gun from. |
| Sharp: | | And then kind of go over the same stuff that we ask him, just there, about why he had the gun, where he got the rounds, blah, blah, blah. |

(*Id.* at 15:20–15:50.) Patrolman Boone then completed a citation for the driver. During this process, another officer offered to collect the firearm, and shortly returned to tell Patrolman Boone that the serial numbers had been filed off. An officer offered to search Mr. Bradley's bag more thoroughly. Upon returning to the bag, Patrolman Boone saw that the officer had located pill bottles and smaller bags. Patrolman Boone began asking about the bags and containers, and Mr. Bradley told him that it was sleep medication. (*Id.* at 23:10–23:20.)

At approximately 1:26 A.M., about 30 minutes after the on-scene statements by Mr. Bradley ended, Patrolman Boone and Mr. Bradley arrived at the Charleston police station, where Patrolman Boone interviewed Mr. Bradley after he was informed of his *Miranda* rights.[3] Mr. Bradley agreed to waive his rights without any overt urging or coercion from Patrolman Boone. During the interview, Patrolman Boone repeatedly thanked Mr. Bradley for his cooperation, and

---

[3] Patrolman Boone stated that reading Mr. Bradley's *Miranda* rights are "just a formality." (Station Video, 0:50–1:00) (Document 44-1B.)

5

often explicitly referred to the on-scene questions and Mr. Bradley's answers.[4] At one point, Mr. Bradley was asked who he purchased the gun from, and Mr. Bradley told Patrolman Boone that he did not wish to disclose that information, and Patrolman Boone did not ask or push that question further. (*Id.* at 7:20–7:40).

## DISCUSSION

Mr. Bradley moves to suppress both post arrest statements made on-scene and off-scene, pursuant to the Fifth Amendment. The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court, in interpreting this right, requires that prior to any custodial interrogation that the police advise the individual that he has the right to remain silent and the right to have an attorney present. *Miranda v. Arizona*, 384 U.S. 479 (1966).

### A. On-Scene Statements

In its response to the motion to suppress, the United States makes clear that the only on-scene statement it intends to introduce is Mr. Bradley's statement that a gun was in his bag. Therefore, the Court will only consider arguments related to that specific on-scene statement. Additionally, the United States does not dispute that the on-scene questioning of Mr. Bradley was a custodial interrogation, or that Mr. Bradley was not read his Miranda rights. Rather, the United States argues that Patrolman Boone's questioning about the contents of the bag falls within the "public safety exception" articulated by the Supreme Court in *New York v. Quarles*, 467 U.S. 649,

---

[4] Some of these instances include Patrolman Boone stating, "You were very open and honest about what you had in the bag, you said you knew you had a parole violation, correct?" (*Id.* at 2:50–3:00.) "You said you were paroled for . . ." (*Id.* at 3:10–3:15.) "I was talking to you while at the traffic stop, I asked you what you had in the bag, and you said you had a gun, correct?" (*Id.* at 4:20–4:35.) "You said . . . what caliber was it?" (*Id.* at 4:30–4:40.) "And you said . . . did you bring it from Detroit?" (*Id.* at 4:40–4:45.) "You said you didn't have anything else in the bag?" (*Id.* at 7:25–7:35.) "You said that it was sleeping . . . er . . . pain [medicine]. . ." (*Id.* at 7:30–7:40.)

657 (1984). This exception allows unwarned statements to be admissible when "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657. Because *Miranda*'s procedural shield is largely directed at "impermissible practices of police interrogation in the presumptively coercive environment of the station house," on-the-scene officers are trusted to "distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 656, 658–59.

If law enforcement was required to read the *Miranda* warning, the suspect "might well be deterred from responding," ultimately elevating the inherent risk of the situation. *Id.* at 657. In adopting the exception, the Fourth Circuit has made clear that "the exception applies not only to protect the public safety but also police safety as well, and that the exception is not to be analyzed in light of the subjective motive of the questioner but rather from the objective perspective of the presence of a public danger." *U.S. v. Mobley*, 40 F.3d 688, 692 (4th Cir. 1994). This exception "must be construed narrowly." *Id.* at 693 (citing *Quarles*, 467 U.S. at 657).

Here, Patrolman Boone's questions about the bag fall squarely within the public safety exception. That is, under the circumstances of this case, the Court finds that Patrolman Boone's questions about the bag were not designed to elicit testimonial evidence. Upon running Mr. Bradley's name through his computer, Patrolman Boone discovered that he was in violation of parole and Michigan would extradite him. As Patrolman Boone was arresting Mr. Bradley, he saw that Mr. Bradley was sitting next to a bag. Because Mr. Bradley was being arrested, and the vehicle was an Uber, the bag would necessarily have to be taken because Mr. Bradley's belongings

7

could not be left in the vehicle.  Therefore, Patrolman Boone knew that he would have to handle the bag, the contents of which were not visible.  His question was reasonably tailored for his own safety to protect him against inadvertently bumping or handling a loaded firearm, needle, or another dangerous object.

The protective purpose of the question is exemplified by the fact that discovery of the bag's contents was inevitable.  The Defendant was arrested for being a parole violator. No party disputes that Patrolman Boone, or another member of the police department, had the authority to search the bag upon the Defendant's arrest.  Thus, questions about the contents of the bag would not have been necessary to obtain a basis for its search.  If the bag had to be handled, there was an objectively reasonable need for the officer to protect himself, and the question could reasonably be motivated by a genuine public safety-related purpose, as opposed to a desire to obtain a confession.  Patrolman Boone's preceding question, "Anything on you I need to know about?" reflects the same purpose.

The Fourth Circuit has not directly addressed a factually analogous situation to that presented here.  In the Fourth Circuit's titular case on the public safety exception, *Mobley*, the suspect was asked, prior to Miranda warnings, whether there was anything in his residence that would endanger law enforcement during the execution of a search warrant and the defendant answered that there was a weapon in the bedroom closet.  *Id.* at 691.  The Fourth Circuit held that the defendant's answer could be suppressed because there was no apparent danger in the situation where the suspect was naked when encountered by law enforcement, law enforcement had already made a security sweep of the premises, and he was at home alone.  *Id.* at 692–93.

8

Here, there was an apparent danger posed by the bag that was required to be taken into custody by law enforcement before leaving the scene, resulting in reasonable safety concerns.

The Fourth Circuit's nonbinding unpublished cases are also sufficiently dissimilar to the facts of this case, and do not guide its outcome. *U.S. v. Melvin*, 05-4997, 2007 WL 2046735, at *11 (4th Cir. July 13, 2007) (un-mirandized statements made in response to questions about a truck were not admissible because the truck was already impounded and there was no public access to the impound lot); *U.S. v. Young*, 58 Fed. Appx. 980, 982 (4th Cir. 2003) (public safety exception applied to an officer's question about guns when other individuals were in the home); *U.S. v. Lloyd*, 581 Fed. Appx. 203, 204 (4th Cir. 2014) (exception applied when the police asked questions about the location of a firearm once another suspect arrived at a crashed vehicle after a high-speed chase of two men suspected of armed robbery); *U.S. v. Hill*, 340 Fed. Appx. 950, 952 (4th Cir. 2009) (exception applied to statements in response to an officer's question about guns when other individuals could be in the home but did not apply to questions about the location of drugs); *U.S. v. Thomas*, 77 Fed. Appx. 673, 675 (4th Cir. 2003) (exception applied to statements in response to an officer's question about guns on the suspect); *U.S. v. Cox*, 955 F.2d 42 (4th Cir. 1992) (exception applied to statements in response to an officer's question about drug use because "drug users often act irrationally")

The threat to officer safety of physical harm caused by the unknown contents of an arrestee's bag that must be moved outweighs the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination, and suppression is inappropriate. Other courts addressing this same issue have held similarly. *U.S. v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008) (the "risk of police officers being injured by the mishandling of unknown firearms or drug

9

paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search"); *U.S. v. Lackey*, 334 F.3d 1224, 1226–27 (10th Cir. 2003) (police may properly ask about the presence of guns or sharp objects on the arrestee because those items presented a risk of physical injury to the police and others if mishandled). Thus, Mr. Bradley's statement in response to the questions about the bag should not be suppressed.

### B. Off-Scene Statements

The Defendant argues that the initial unwarned statements taint the subsequent warned statements. The Supreme Court addressed this situation in *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, the Supreme Court stated that when determining whether to suppress a subsequent inculpatory statement made after a midstream *Miranda* warning, the "relevant inquiry is whether, in fact, the second statement was also voluntarily made." 470 U.S. at 318. Otherwise stated, the mere fact that an initial voluntary unwarned admission has been made does not amount to compulsion or coercion, "absent deliberately coercive or improper tactics in obtaining the initial statement." *Id.* at 314. In order to determine whether that second statement is voluntarily made, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect." *Id.* at 318. "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id. at* 318.

Here, the Court finds that the Defendant voluntarily waived his Fifth Amendment rights and did not waive his rights due to coercion with respect to either the initial or subsequent statements. In both the initial and subsequent questioning, although the Defendant was in handcuffs, the Defendant was not threatened or told he had to answer Patrolman Boone's

questions. Patrolman Boone made no promises of kind treatment or leniency if Mr. Bradley responded to the questioning. At no point did Patrolman Boone yell or use an aggressive tone when asking the questions. Rather, the tone throughout both interrogations was conversational. Lastly, for the off-scene statements, Mr. Bradley was ultimately informed of his rights and decided to waive them. Mr. Bradley knew how to exercise his right to remain silent, as is shown when he declined to answer Patrolman Boone's question about the seller of the handgun. When Mr. Bradley declined to answer the question, Patrolman Boone did not pressure him to answer and dropped the question entirely. Other than that sole question, Mr. Bradley did not show any hesitancy or reluctance to answer Patrolman Boone's questions. Therefore, it cannot be said that Mr. Bradley's waiver of his Fifth Amendment rights was involuntary or coerced.

The Defendant argues that the post-mirandized statements of Mr. Bradley should be excluded pursuant to the Supreme Court's later expansion of *Elstad* in the case of *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, the Supreme Court held that some voluntary statements given after a *Miranda* warning could be tainted if the warning was given after an unwarned confession or given "midstream.[5]" 542 U.S. at 617 (2004). The Fourth Circuit has held that Justice Kennedy's concurrence, as the narrowest ground, represents the holding of the Supreme Court, which states that voluntary post-*Miranda* confessions can be excluded "only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." *U.S. v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (citing *Id.* at 622). Otherwise stated, the two-step interrogation must be "deliberately employed" as a tactic. *Id.*

---

[5] Also referred to as a "question-first tactic." 542 U.S. at 617.

Here, the Court finds no evidence of intent on the part of Patrolman Boone to undermine Mr. Bradley's Fifth Amendment rights. True, some evidence, namely the on-scene warning from Sergeant Sharp and the similarity in questions between the on and off scene interrogation, is indicative of the deliberate use of the two-step process. However, the Court, having heard the testimony and having assessed the officer's credibility, finds there is more compelling evidence pointing to the contrary. Patrolman Boone testified that he did not have any specific reason for not providing the Miranda warning before he began questioning Mr. Bradley. (Boone Tr. at 9:15–17.)[6] He also stated that he had never been trained in the two-step or midstream questioning tactic, he had never heard of that technique before this case, and it was not his intent to use such a tactic when questioning Mr. Bradley.[7] (*Id.* at 10:13–23.) The Court finds this evidence to be credible. Even though Sergeant Sharp did instruct Patrolman Boone to mirandize Mr. Bradley at the police station, the comment appears to be more like cautionary guidance from a supervisor, not confirmation of an intent to deploy a ruse or tactic.[8] The evidence before the Court reflects that Patrolman Boone's failure to mirandize Mr. Bradley on the scene is fairly characterized as inadvertence or mistake, as opposed to a deliberate tactic.[9]

---

[6] The Court has utilized a rough transcript. The exact final language and location of the cited statements may vary.

[7] During Patrolman Boone's cross-examination, defense counsel questioned him about whether he knew that failing to provide a Miranda warning immediately upon arrest was a violation of the Charleston Police Department's policies, and Patrolman Boone stated that he did not know that was improper. (*Id.* at 20:19–23.) Patrolman Boone's lack of knowledge about the policy amplifies the fact that he did not intentionally deploy the two-step tactic.

[8] The Court notes that it would have much preferred Patrolman Boone, or any officer in such a situation, to have provided the Miranda warning immediately upon arrest and before asking any questions. However, under these facts, the Court finds the statements to be legally admissible.

[9] At the suppression hearing, the United States argued that it should be the Defendant's burden to prove the two-step inquiry was deliberately employed. The Court finds that even if it was the United States' burden, it has been established that Patrolman Boone did not deliberately engage in the two-step method, and therefore, it is unnecessary to reach this argument.

12

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the Defendant's *Motion to Suppress Post-Arrest Statements Obtained in Violation of the Defendant's Constitutional Rights* (Document 42) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: May 1, 2023

*Irene C. Berger*
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA